GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

ERICA L. SEGER
State Bar No. 022681
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
erica.seger@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br>    v.<br><br>Brent Myers,<br><br>        Defendant. | CR-20-00588-TUC-JCH<br><br>GOVERNMENT'S<br>SENTENCING MEMORANDUM |

Now comes the United States, by and through its undersigned attorneys, and submits the following sentencing memorandum for the sentencing scheduled on October 14, 2021. For the reasons contained in the PSR, this sentencing memorandum, and matters to be discussed more fully at sentencing in this matter, the United States asks the Court to sentence the defendant to a sentence of **78 months imprisonment**, which reflects the seriousness of the offense and the other § 3553(a) factors, followed by **lifetime supervised release**.

I. **GOVERNMENT'S AGREEMENT WITH PSR GUIDELINE CALCULATIONS**

The United States agrees with the calculations as stated in the Presentence Report, hereinafter "PSR," dated May 19, 2021. These calculations would place the defendant at a total offense level of 30, with a Criminal History Category of I, which results in a

guideline sentencing range of 97-121 months.

The PSR recommends 78 months imprisonment. The government agrees with the recommendation made by Probation in this case, and with the stated basis for that recommendation, and requests that the defendant be sentenced to no less than 78 months imprisonment and lifetime supervised release.

## II. FACTUAL HISTORY

HSI Special Agent (SA) Robert McCarthy initiated the use of investigative software that was connected to the Internet to conduct an investigation on the eMule/ED2K peer-to-peer (P2P) file-sharing network. Between July of 2016 and February of 2018, the investigative software established a direct connection to the computer using the above-listed IP addresses on multiple occasions and downloaded portions of several files of interet (FOI) files from it (i.e., the investigative software obtained partial downloads of FOI files from the suspect computer). Among the partial downloads were the following files (the filenames listed below reflect the filenames as they appeared on the suspect computer):

IP Address: 65.129.204.97

Date: February 19, 2018

Filename: (Pthc) Sex With The 10-Year Girl (, Children, Girls, Youngsters).avi

Description: This is a video file that depicts a prepubescent girl who appears to be approximately 9 to 11 years old. The video begins with the girl posing in her underwear (she is topless). During the downloaded portion of the video, the girl rubs her buttocks and pubic area with her hands under her underwear, and the camera zooms in on those areas as she does this. The downloaded portion of the video then cuts to show the girl lying nude on a bed. While there, the girl spreads her legs open and rubs her body (including her pubic area) with her hand, and the camera zooms in on her pubic area as she rubs that part of her body. Two other brief clips appear later in the downloaded portion of the video that appear to depict an adult male rubbing his penis on the girl's pubic area and/or anus.

Agents executed a federal search warrant at an address on S. Camino de Oeste,

Tucson, Arizona on April 26, 2018. This is the residence of the defendant and his wife. Multiple electronic devices were seized included those listed in Counts 3-6 of the indictment. In all, agents seized two desktop computers, eight laptop computers, three tablets, nine hard drives, five digital cameras, two MP3 players, 24 digital media storage items, eight cellular phones, 38 floppy disks, 10 VHS tapes, and 138 compact disks from the residence. The PSR describes the child sexual abuse material files that were located on the various devices. (PSR ¶¶ 27-43.)

### III.   SENTENCING CONSIDERATIONS UNDER 18 U.S.C. SECTION 3553(a)

Although the U.S. Sentencing Guidelines are advisory, the Court still begins its analysis by properly calculating the applicable range the defendant faces under § 2G2.2. *See United States v. Booker*, 543 U.S. 220, 245 (2005). The Supreme Court has declared, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 41 (2007). The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice" and reflect "a rough approximation of sentences that might achieve § 3553(a)'s objectives." *United States v. Rita*, 551 U.S. 338, 350 (2007). As the Ninth Circuit pointed out in *United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011), "sentencing courts must continue to consider the applicable [child pornography] Guidelines range as 'the starting point and the initial benchmark.'" *Id*. at 959 (quoting *Gall*, 552 U.S. at 49). Moreover, while the Ninth Circuit in *Henderson* held that a court's disagreement with the guidelines for policy reasons may be used as a reason to give a below-guidelines sentence, the Court also emphasized that a district court may "disregard the Guidelines only where it is 'reasonable' for a court to do so." *Id*., at 968 (Justice Callahan concurring, citing *U.S. v. Pepper*, 131 S.Ct 1229, 1252 (2011)). Thus, in child pornography cases, a significant number of courts from across the country, including the Ninth Circuit, have consistently upheld guideline sentences for child pornography cases as reasonable. *See, e.g., United*

*States v. Carlson*, 395 Fed.Appx. 413 (9th Cir. 2010) (unpublished) (98 month sentence reasonable); *United States v. Blinkinsop*, 606 F.3d 1110 (2010) (within-guidelines sentence of 97 months affirmed, with recognition that "when a district judge imposes a sentence within the Guidelines range, it is probable that the sentence is reasonable" and that a "sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case.").[1]

### A.      The Harm of Child Pornography

In terms of the harm done to the children depicted in child pornography images, the Ninth Circuit has determined that there is no difference between the production of child pornography and other child pornography crimes that cause the distribution of the images, as the "distribution of photographs and films depicting sexual activity by juveniles is

---

[1] *See also*, *United States v. Sanders*, 2014 WL 768449 (9th Cir. Feb. 27, 2014) (unpubl); *United States v. Rice*, 540 F. App'x 782 (9th Cir. 2013); *United States v. Mills*, 518 F. App'x 540 (9th Cir. 2013); *United States v. Maggio*, 499 F. App'x 696 (9th Cir. 2012); *United States v. Frantz*, 485 F. App'x 890 (9th Cir. 2012); *United States v. Grigsby*, 469 F. App'x 589 (9th Cir. 2012); *United States v. Shigley*, 451 F. App'x 705 (9th Cir. 2011); *United States v. Maier*, 639 F.3d 927 (9th Cir. 2011); *United States v. Aguirre*, 448 F. App'x 670 (9th Cir. 2011); *United States v. Alfaro*, 446 F. App'x 840 (9th Cir. 2011); *United States v. Psick*, 434 F. Appx 646 (9th Cir. 2011); *United States v. Aglony*, 421 F. App'x 756 (9th Cir. 2011); *United States v. Anthony*, 421 F. App'x 674 (9th Cir. 2011); *United States v. Richards*, 414 F. App'x 911 (9th Cir. 2011);*U.S. v. Reilly*, 662 F.3d 754 (6th Cir. 2011)(151 month guideline sentence reasonable for  distribution of child pornography); *United States v. Davis*, 402 Fed.Appx 607 (2nd Cir., 2010) (unpublished)(guideline sentence reasonable despite defendant's age and health issues); *United States v. Scalise*, 398 Fed. Appx. 736 (3rd Cir. 2010)(guideline sentence upheld); *United States v. Stabile,* 633 F.3d 219 (3rd Cir. 2011); *United States v. Moore*, 373 Fed.Appx. 168 (3rd Cir. 2010) (unpublished) (120 months reasonable); *United States v. McMickens*, 373 Fed.Appx. 226 (3rd Cir. 2010) (unpublished)(109 months for receipt reasonable); *United States v. Garcia*, 402 Fed.Appx. 768 (4th Cir., 2010) (unpublished)(guideline sentence reasonable); *United States v. McKee*, 2010 WL 1664081 (D.Md. April 21, 2010) (unpublished); *United States v. Warner*, 399 Fed.Appx. 88 (6th Cir. 2010) (unpublished)(guideline sentence upheld); *United States v. McNerney*, 636 F.3d 722 (6th Cir. 2011); *United States v. Brown*, 634 F.3d 954(7th Cir. 2011)(240 months for possession and transportation upheld); *United States v. Coopman*, 602 F.3d 814 (7th Cir. 2010)(151 month guideline sentence reasonable for possession and receipt); *United States v. Maulding*, 627 F.3d 285 (7th Cir. 2010)(declining to apply reasoning of *Dorvee*); *United States v. Koch*, 625 F.3d 470 (8th Cir. 2010)(78 months for possession reasonable); *United States v. Bauer*, 626 F.3d 1004 (8th Cir. 2010)(guidelines sentence upheld for attempted receipt); *United States v. Regan,* 627 F.3d 1348 (10th Cir. 2010)(guidelines reasonable in receipt case);*United States v. Wayerski*, 624 F.3d 1342 (11th Cir. 2010); and *United States v. Alfaro-Moncada*, 607 F.3d 720 (11th Cir. 2010)(guideline sentence upheld).

intrinsically related to the sexual abuse of children. . . . [T]he materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation." *United States v. Boos*, 127 F.3d 1207, 1211 (9th Cir. 1997), quoting *New York v. Ferber*, 458 U.S. 747, 759 102 S.Ct. 3348, 3355 (1982). In *Ferber*, 458 U.S. 747 (1982), the Supreme Court noted:

> As one authority has explained: [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography. Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act, 17 Wake Forest L.Rev. 535, 545 (1981).

*Ferber*, 458 U.S. at 758, fn. 10. *See also*, Schoettle, *Child Exploitation: A Study of Child Pornography*, 19 J.Am.Acad.Child Psychiatry 289, 292 (1980) 292 ("[I]t is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions"); *Note, Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation*, 12 U.Mich.J. Law Reform 295, 301 (1979) (interview with child psychiatrist: "The victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child"). *Id*.

Further, as this Court well knows, this defendant did not access and use child pornography in a vacuum. By logging onto the internet and seeking child pornography, the defendant not only exposed the victims in the images to additional harm, but also contributed to the demand for child pornography. As with any business, a demand causes the supply to increase. In the case of child pornography, receiving, possessing, and distributing child pornography directly contributes to the demand for more, increasing the sexual victimization of still more children. The Ninth Circuit has repeatedly recognized this connection, such as in *United States v. Blinkinsop,* 606 F.3d 1110 (9th Cir. 2010), stating,

> [M]erely possessing [or receiving] child pornography is not a victimless crime," because "**it fuels the demand for the creation and distribution of child pornography**," and evidence shows "the harm that children suffer

when they are used in the creation of child pornography. . .when that pornography is distributed to others.

*Id.,* at 1117, fn. 7 (citing *United States v. Daniels*, 541 F.3d 915, 924 (9th Cir. 2008) (emphasis added)). *See also, United States v. Adams*, 343 F.3d 1024, 1032 (9th Cir. 2003); 136 Cong. Rec. at S4730 ("those who possess and view child pornography encourage its continual production and distribution").

The fact that the children suffer sexual abuse in the first place is a horrible reality. By viewing and sharing the digital record of these children's suffering, the defendant continued the exploitation for his own and others' gratification every time he viewed or exchanged these images. When these pictures are distributed over the internet, and when people such as the defendant seek them out and create a demand for them, the victims are left unable to heal, haunted by the images for the rest of their lives. *See United States v. Stevens*, 197 F.3d 1263, 1269, n. 6 (9th Cir. 1999); *see also United States v. Boos*, 127 F.3d 1207, 1209-10 (9th Cir. 1997). The victim impact statements submitted in connection with this case outline the broad and lasting trauma viewers of child pornography continue to inflict on the victims in the images and videos the defendant used.

The harm of child pornography is even further exacerbated when one considers that this crime is one that is often used to facilitate new abuse and the production of new images. Courts and Congress have recognized that defendants often use child pornography to show to other children as part of the grooming process in getting the children to believe that having sex with adults is acceptable. *United States v. Maxwell*, 386 F.3d 1042, 1065 n. 22 (11th Cir. 2004) (quoting Congress' findings that child pornography is often used as part of method of seducing other children into sexual activity) (vacated and remanded on other grounds, 546 U.S. 801, 126 S.Ct. 321, 163 L.Ed.2d 29 (2005)). Moreover, Courts and researchers have consistently recognized that people who have an interest in child pornography often molest children.[2]

---

[2] In Seto, Cantor, and Blanchard, "*Child Pornography Offenses Are a Valid Diagnostic Indicator of Pedophilia*" Journal of Abnormal Psychology, 2006, Vol. 115, No. 3, pp. 610–

B. **Child Pornography Offenders Often Are Child Sexual Abusers**

The research goes beyond finding that people who collect the images of the sexual abuse of children are sexually aroused by them, however. The most recent study to address this was published in the Journal of Sexual Aggression in 2014 and provides yet more proof that those who collect child pornography pose a very real danger to children. In Bourke *et.al.* (2014): "*The use of tactical polygraph with sex offenders*" Journal of Sexual Aggression: An international, interdisciplinary forum for research, theory and practice, DOI:10.1080/13552600.2014.886729, the authors compiled the findings from three different federal agencies' use of tactical polygraphs with men under investigation for non-contact child pornography offenses. The polygraphs were administered to a total of 127 suspects on the day of, or within 5 days of, the execution of a search warrant for child pornography at their residences. None of the men had any known history of hands-on sexual abuse, and prior to the polygraph, only 4.7% (6 men) admitted to having committed a hands-on sexual offense against a child in the past. After a tactical polygraph, an additional 52.8% (67 additional men) of participants admitted to having committed sexual abuse of a child. All told, **57.5% of the 127 men admitted to already having sexually abused a child**, with 10 of the participants admitting to actively victimizing a child at the time.[3]

The conclusions in the recent Bourke study are very much in line with other research. In Seto, Hanson, & Babchishin, "*Contact Sexual Offending by Men with Online Sexual Offenses*" Sexual Abuse: A Journal of Research and Treatment 23(1), 124-145,

---

615, the authors found that collectors of child pornography were 2.8 times more likely to be pedophiles than other offenders against children. They wrote, "[o]ur results indicate that child pornography offending is a valid diagnostic indicator of pedophilia… In fact, child pornography offenders, regardless of whether they had a history of sexual offenses against child victims, were more likely to show a pedophilic pattern of sexual arousal than were a combined group of offenders against children." Id. at 613. This research merely confirms the common sense notion that someone who collects pictures and videos of children engaged in sexual activity is likely to be sexually aroused by such images.

[3] As a result of the admissions made during the post-polygraph interviews, a total of 282 victims were disclosed, and 97 victims who were still minors were identified by name.

December 2010, the authors conducted a meta-analysis of 24 studies of online sexual offenders. They found that, if the only indicator one relied upon was arrests or convictions, the number of these men who were involved in contact offenses with children was low – generally less than 20%. However, when studies used polygraph testing, or some other means to insure honest, self-reporting (such as anonymity or immunity from prosecution as part of a treatment program), the numbers were radically different. The studies with these types of validation determined that **fifty-five percent** of the men whose only charged offense was the receipt and possession of child pornography admitted to contact offenses against children. The Seto study was based upon many studies, but its results have been confirmed by other independent studies as well.  In Buschman, Wilcox, Krapohl, Oelrich, & Hackett, *"Cybersex Offender Risk Assessment. An Explorative Study"* Journal of Sexual Aggression, July 2010, Vol. 16, No.2, pp. 197-209, the study subjects were again limited to individuals whose only offense was possession of child pornography. As in the Seto research, fifty-five percent of the subjects in that study, when polygraphed, admitted to contact offenses with children.[4]

---

[4] Another published study suggests the rate of cross-over between child pornography offenders and hands-on offenders is even higher. *"The 'Butner Study' Redux: A Report on the Incidence of Hands on Child Victimization by Child Pornography Offenders,"* Bourke and Hernandez, 24 J.Fam.Viol. 183-191 (2009).  That study focused on 155 offenders enrolled in the Butner Sex Offender Treatment Program, all of whom had been convicted of possession, distribution, or receipt of child pornography.  Of these 155, 115 had no documented acts of hands-on child sex abuse at the time of their sentencing.  When the researchers sought to determine to what extent this reflected the real danger presented by these offenders, what they learned was alarming.  After treatment, including polygraphs, 91 of those 115 (over 79%) who had no known history of hands-on victims ultimately admitted having engaged in hands-on sexual abuse of children. Thus, after treatment, 85% of the total sample of 155 men convicted of child pornography offenses revealed past hands-on behavior against children.  The authors also concluded that for the vast majority of subjects in their sample, internet-based child pornography offense was an adjunctive behavior, that is, "their collecting and trading behaviors were simply behavioral manifestations of a larger, more pervasive, and enduring paraphilic lifestyle." *Id.,* at 188. While this study has been recently criticized as an "outlier" and subject to some questions regarding the motivations for the large number of self-disclosures, one of the authors addressed these concerns in detail via a submission to the U.S. Sentencing Commission. This submission to the U.S. Sentencing Commission can be found at the following website: http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20120215-16/Testimony_15_Bourke.pdf.

Although the government has no specific information indicating that this defendant has sexually abused a child in person, the several items of concern in the psychosexual evaluation should give rise to concern about the defendant posing a true risk to children.

## C.   **Recidivism is Difficult to Assess and Vastly Under-Estimated**

This Court should give very limited credit to any argument that online offenders have a low rate of recidivism. This is misleading, since recidivism is defined in terms of subsequent arrests. Low levels of contact offenses based upon arrests should not be surprising. Unlike other offenders, child molesters do not boast about their crimes. In addition, victims of sex crimes are reluctant to report such crimes. Children are particularly reluctant to talk about sexual abuse. Bonta & Hanson, "*Gauging the Risk for Violence: Measurement, Impact and Strategies for Change*" (1994) (published by the Solicitor General Canada, Ministry Secretariat (Ottawa)); Hanson & Bussière, "*Predictors of Sexual Offender Recidivism*" (1996) (published by the Solicitor General Canada, Ministry Secretariat (Ottawa)).  Thus, low recidivism numbers based upon arrests and convictions should be expected.  However, when offenders are subject to a polygraph examination, or are assured that their admissions will not result in further prosecution, the number of admissions consistently jumps to more than half.  As the Seventh Circuit's Judge Posner recently wrote in *United States v. Garthus*, 652 F.3d 715, 720 (7th Cir. 2011),  "We need evidence-driven law just as we need evidence-driven medicine.  Statistical analysis of sex crimes has shown that the best predictor of recidivism is not deportment at an interview but sexual interest in children." *Id*. at 720 (citations omitted.)  Those who collect images of children subject to sexual abuse find sexual stimulation in those images. It should not come as a surprise to find that a large number of them have acted upon those impulses.

In another recent article, Ecke, Seto, and Williams, *Examining the Criminal History and Future Offending of Child Pornography Offenders: An Extended Prospective Follow-up Study*, Law and Human Behavior (2011), 466-478, the authors observed that while

recidivism rates (*i.e.,* rearrest rates) were low, they increased over time. Seto and Ecke's 2011 article was a follow up to their 2005 research on this question. While the original study followed offenders for an average period of 2.5 years, the new study extended that to 5.9 years. The continued monitoring of these defendants produced a disturbing trend that showed an increase in recidivism.

|  | Seto & Ecke (2.5 yrs)(2005) | Ecke, Seto, & Williams (5.9 yrs) (2011) |
|---|---|---|
| Any contact sexual offense | 4.5% | 6.0% |
| Any noncontact sexual offense | 6.5% | 11% |
| Any child pornography offense | 6.0% | 9.5% |

The above research is in line with other research indicating that the longer a sex offender is in the community, the greater the likelihood that he will be caught reoffending.[5]

Facts in this case raise significant concerns about the defendant's likelihood to reoffend. The defendant's downloading, viewing and masturbating to child sex abuse material involved conduct over an extended period of time and a wide variety of material; he has not openly admitted his behavior and his sexual attraction to children remains. (PSR ¶¶ 81, 85-87, 92.) This behavior shows a deliberateness and devotion to his habit of searching for, downloading and masturbating to his child pornography collection. This devotion to concealing his behavior, and his continued unwillingness to take full responsibility for his actions in this case raises considerable concern about the defendant's risk to reoffend in the future.

---

[5] Because most studies relating to recidivism pertain to "hands-on" offenses, recidivism rates for re-offense by collecting or viewing child pornography are less of a known quantity. However, common sense dictates that re-offense is more likely to occur because it is easier to achieve in the privacy of one's home, simply by turning to a computer or one of many other devices with access to the Internet; such re-offense is also arguably harder to detect. Moreover, although "possession-only" offenses do not involve the challenge of obtaining a child, the children in the pictures are real indeed, and are continually violated by people who collect, trade, and use images of their sexual abuse for gratification.

### D. Specific Sentencing Factors in This Case

As the Congressional findings, studies, and case law above clearly establish, there are well-grounded fears with respect to internet-based offenses relating to sexual abuse of children. Recognition of the seriousness of the offense, the harm caused by the offense, and the need for deterrence all weigh in favor of lengthy sentences for child pornography offenders. As the Seventh Circuit has noted:

> Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded-both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. E.g., *Osborne v. Ohio*, 495 U.S. 103, 109–11, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006); *United States v. Richardson*, 238 F.3d 837, 839 (7th Cir. 2001); *United States v. Angle*, 234 F.3d 326, 337–38 (7th Cir. 2000). Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced.

*United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007).

Further, although the defendant provides various sentencing examples from Courts in this District, he fails to include any of the vast majority of cases with sentences similar to that recommended by both the United States and probation department in this case. The sentence of the Court should reflect the fact that the defendant caused tremendous suffering to these victims by participating in the continuation of their abuse, serve as a needed deterrent to future conduct by either the defendant or other defendants.

### IV. LIFETIME SUPERVISED RELEASE IS APPROPRIATE

Regardless of the term of imprisonment, this Court should impose a term of supervised release that extends for the life of the defendant. "Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Supervised release is not a punishment in lieu of

incarceration. *See United States v. Granderson*, 511 U.S. 39, 50 (1994). If being on supervised release were the punitive equivalent of being in prison, and if it served the just desserts function, there would be no need to put most criminals in prison. *See United States v. Irey*, 612 F.3d 1160, 1210 (11th Cir. 2010). The life term recommendation contained in Section 5D1.2(b) is evidence that recidivism rates for sex offenders do not appreciably decline as offenders age. *See* H.R. Rep. No. 107-527, at 2 (2002) (discussing the merits of a life term of supervised release for sexual offenders); *see also supra* (discussing defendants over the age of 60 who have committed similar federal child exploitation crimes). Because, in sex crimes cases, there is no reason to believe that the need for supervision inherently decreases with time, Congress found lifetime supervised release to be appropriate, and thus directly inserted such a recommendation into the Guidelines. *See id*. More specifically, the passage of 18 U.S.C. § 3583(k) recognized the long-standing concerns of federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders, particularly for the perpetrators of child sexual abuse crimes, whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison. Many of these offenders need long term or lifetime monitoring and oversight. *See* H.R. Conf. Rep. No. 108-66, at 49-50 (2003), *reprinted in* 2003 U.S.C.C.A.N. 683, 684.

V. **CONCLUSION**

Based on the serious nature of this offense and the personal characteristics of the defendant, a sentence of no less than 78 months is appropriate, and lifetime supervised release.

Respectfully submitted this 12th day of October, 2021.

GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

*s/Erica L. Seger*

ERICA L. SEGER
Assistant U.S. Attorney

A copy of the foregoing served by electronic
or other means this 12th day of October, 2021, to:

All ECF Participants